**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JOSEPH MILLER #127-380                    *

           Plaintiff,               *

     v.                                         CIVIL ACTION NO. ELH-11-3728

                             *

CHRISTOPHER COLLIER, RN, et al.,[1]

                             *

           Defendants

                            ******

**MEMORANDUM**

On December 22, 2011, the self-represented plaintiff, Joseph Miller, filed a civil rights

complaint pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that staff at Springfield Hospital

Center ("Springfield") in Maryland refused to follow a physician's order that he wear special

boots to ameliorate pain caused by an underlying foot condition.  ECF No. 1, as supplemented by

ECF No. 5.   Miller also complained that certain prescribed medications caused sexual

dysfunction (ECF Nos. 6 and 8), and that a religious artifact, a necklace containing a cross, was

confiscated from him, in violation of his rights under the First Amendment to the Constitution.

*See* ECF Nos. 7, 16, and 17.  Defendants Christopher Collier, Natalie Purvic, Charles Zeitler,

Christine Anchan, and Adela Valadez-Meltzer have filed a dispositive motion addressing these

claims.[2]  ECF No. 10.  Miller opposes the motion (ECF No. 12), and has moved for summary

---

[1] The Clerk shall amend the docket to reflect the full name and correct spelling of the
name of defendant Adela Valadez-Meltzer.

[2] The timely response renders moot Miller's "Motion to notify Defendant(s) to Answer . .
. ."  ECF No. 9.  Miller also attempts to amend his complaint to allege that defendant Anchan
violated his right to privacy by discussing lab results within earshot of other patients at

judgment.  ECF No. 5; ECF No. 25.[3]  No hearing is needed to resolve the issues presented in this case.[4]  *See* Local Rule 106.5.

## Standard of Review

Defendants have moved to dismiss or, in the alternative, for summary judgment.  They have appended several declarations in support of their Motion.  *See* ECF 10-2 to 10-6.  "'The purpose of a Rule 12(b) (6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A motion under Rule 12(b)(6) constitutes an assertion by the defendants that, even if the facts alleged by the plaintiff are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted."  In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "'accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff.'" *Brockington v. Boykins*, 637 F.3d 503, 505–06 (4th Cir.2011) (citation omitted).

---

Springfield.  ECF Nos. 16, 17, 21, 23, 24 and 26.  This claim is not before the Court and is not under consideration.

[3] In ECF No. 25, Miller alleges his medications were discontinued for several days when he was transferred from Springfield to a detention center in Montgomery County for resolution of a criminal charge pending against Miller.  Although Miller is free to file a separate action concerning the alleged deprivation of medical care during this period of time, that matter is unrelated to the allegations he raised in the instant action and shall not be addressed herein.  The motion (ECF No. 25) is nonresponsive and is hereby denied.  Similarly, Miller's claim of unlawful confinement, while perhaps actionable in a habeas corpus action, is not at issue here.  Should Miller choose to attack his conviction and/or his detention at Springfield, he may request the appropriate forms from the Clerk after first exhausting such claims under the processes provided in the state courts.  As to ECF No. 5, in which Miller seeks summary judgment based on the physical ailments he suffered due to defendants' refusal to permit him to wear his boots, that Motion is denied for the reasons set forth in this Memorandum.

[4] Accordingly, Miller's motion to compel oral argument (ECF No. 18) is denied, as are his motions to subpoena additional records (ECF No. 16) and to compel settlement.  ECF No. 17.  Appointment of counsel (requested in ECF No. 19) is not warranted, pursuant to 28 U.S.C. § 1915(e)(1).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, Rule 12(d) permits a court, in its discretion, to consider matters outside of the pleadings on a motion under Rule 12(b)(6). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *See Finley Lines Joint Protective Board. Unit 200 v. Norfolk Southern Corporation*, 109 F.3d 993, 997 (4th Cir.1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided in this determination by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165–67.

This Court deems it appropriate to consider the declarations submitted by defendants, as they are likely to facilitate disposition of this case. Notably, plaintiff has had adequate notice of the possibility of conversion to summary judgment. *See Laughlin v. Metro Wash. Airports Authority,* 149 F.3d 253, 261 (4th Cir. 1998); *Roseboro v. Garrison,* 528 F.2d 309, 210 (4th Cir.

1975); *see also* ECF 40.   Accordingly, defendants' motion shall be treated as a motion for summary judgment.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"   *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).   A fact is "material" if it "might affect the outcome of the suit under the governing law."   *Anderson*, 477 U.S. at 248.   There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id*.

In resolving a summary judgment motion, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.   *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Dennis v. Columbia Colleton Medical Center, Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).   Here, because plaintiff is self-represented, his submissions are liberally construed.   *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   Nonetheless, the court must abide

by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24, (1986)).

## Factual Background[5]

Miller was arrested in Montgomery County, Maryland on October 26, 2011, charged with one count of fourth-degree burglary, two counts of indecent exposure, and one count of urinating in public.  He was confined in the Montgomery County Detention Center ("Detention Center"). *See Miller v. Social Security Administration*, ELH-11-3592 (D. Md.).  On October 27, 201, a state district court judge ordered Miller held without bail, ordered him held at the Detention Center pending a competency evaluation by the Maryland Department of Health and Mental Hygiene ("DHMH"), and ordered his return to court on November 3, 2011.  *Id*.  Miller was admitted to Springfield on or about December 5, 2011, after the Montgomery County District Court found him incompetent to stand trial.  *Id*.[6]  Springfield is a regional psychiatric hospital operated by DHMH.  On May 7, 2012, Miller pleaded guilty to one count of indecent exposure. *http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=4D00275552&loc=23&detailLoc=DSCR*

In December 2011, when Miller filed this action, he was a patient at Springfield, housed

---

[5] Defendants have provided much of the factual background, which is uncontroverted. However, some of the facts derive from the case of *Miller v. Social Security Administration*, ELH-11-3592 (D. Md.).  The Court may take judicial notice of its own records.  *See Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990).

[6] On May 14, 2012, Miller filed a "Motion for Extension of time" (ECF No. 30), asserting that he was discharged from Springfield on April 30, 2012, is homeless, and his discharge was for the purpose of denying plaintiff access to legal records and other property.  This Motion shall be denied.

on the Acute Care Services – Salomon A Unit. ECF No. 10, Exhibit 1.   Defendants, all Springfield employees, were members of Miller's treatment team.   On January 12, 2012, Miller was transferred to Salomon B Unit.   As of that time, defendants were no longer members of plaintiff's treatment team.   *Id*., n.1.

Defendant Collier is an RN Supervisor and the head nurse on the unit where Miller initially was held while at Springfield.   *Id*., Exhibit 1, Declaration of Christopher Collier ("Collier Declaration") ¶ 2.   Defendant Purvis was Miller's treating psychiatrist while he was on the Acute Care Services Unit, with the exception of the period from December 12, 2011 through December 16, 2011 and again on December 19, 2011, when she was off-duty.   *Id*., Exhibit 2, Declaration of Natalie Purvis ("Purvis Declaration") ¶ 2, 17.   While Defendant Purvis was off-duty, Defendant Valadez-Meltzer served as Miller's treating psychiatrist. *Id*., Exhibit 3, Declaration of Adela Valadez-Meltzer ("Valadez-Meltzer Declaration") ¶ 6.   Defendant Anchan was Miller's social worker and assigned to his treatment Team, *id.,* Exhibit 4, Declaration of Christine Anchan ("Anchan Declaration") ¶ 2, while defendant Zeitler was the forensic psychologist assigned to Mr. Miller.   *Id.,* Exhibit 5, Declaration of Charles Zeitler ("Zeitler Declaration") ¶ 2.

Miller was initially diagnosed with Psychotic Disorder (Not Otherwise Specified). Purvis Declaration ¶ 7.  This was later modified to a more specific diagnosis of Bipolar Disorder, with manic and psychotic features.  Purvis Declaration ¶ 7.

At the time of Miller's admission to Springfield, Dr. Purvis prescribed Risperidone to treat Miller's psychosis.  Purvis Declaration ¶ 15.  After Miller refused this medication, Purvis prescribed Perphenazine.  Purvis Declaration ¶ 16.   Miller was non-compliant with this medication as well. From December 12, 2011 through December 16, 2011 and on December 19,

2011, while Purvis was off-duty, Dr. Valadez-Meltzer provided psychiatric care to Miller. Purvis Declaration ¶ 17.   On December 12, 2011, Miller became agitated and loud, and was unable to be calmed.   Valadez-Meltzer Declaration ¶ 11.   Valadez-Meltzer modified his medication to Fluphenazine for psychosis and agitation, Diphenhydramine Concentrate to counter potential side effects of Fluphenazine, and Lorazepam for agitation.   Valadez-Meltzer Declaration ¶ 12.   The risks, benefits, and side effects of these medications were discussed with Miller before they were prescribed by Defendant Valadez-Meltzer.   Valadez-Meltzer Declaration ¶ 13.   Miller voluntarily took these medications.     Although he took the medications intermittently, Miller was never forced to take these medications.   Valadez-Meltzer Declaration ¶ 15.

On December 19, 2011, Miller complained that he could not "masturbate or have an erection."   Valadez-Meltzer Declaration ¶ 17.   When Purvis returned on December 20, 2011, and learned of Miller's complaints, she modified his medications to Risperidone, Diphenhydramine, and Clonazepam to alleviate the side effects that he was experiencing.   Purvis Declaration ¶ 20. Miller registered no further complaint concerning medication side effects.   Purvis Declaration ¶ 20.

On December 15, 2011, Miller received a metal rope necklace and a cross pendant in the mail.   Collier Declaration ¶ 16.   Because the necklace was heavy and could be used to injure Miller or other patients or staff, it was confiscated and placed in a locked storage room on the unit.   Collier Declaration ¶ 16.   Miller was given the opportunity to keep the cross pendant, but he refused and asked that the pendant be placed in storage as well.   Collier Declaration ¶ 16.   On December 19, 2011, Miller requested the cross pendant to be returned to him, and it was returned to him on a string.   Collier Declaration ¶ 17.   Miller kept the pendant in his possession for the

remainder of his time on Unit A.

After arriving at Springfield, Miller ordered Polo by Ralph Lauren "Allendale" ankle boots, which have a rubber and reinforced toe, leather lace-up front, and 1 ¼ heel. Collier Declaration ¶ 4. The treatment team evaluated the boots and determined them to be unsafe for Miller to have while he was at Springfield, Collier Declaration ¶ 7, as at that time Miller was highly symptomatic, paranoid, hostile, argumentative, and suspicious. Purvis Declaration ¶ 10. The boots were placed into a locked storage room on the unit. Valadez-Meltzer Declaration ¶ 7.

Shortly after his boots were taken away, Miller began to complain of foot pain. Collier Declaration ¶ 10. Miller met with a podiatrist, Dr. Marc Singer, who recommended that Miller be permitted to wear either high top boots and/or orthotic insoles to alleviate his foot pain. Collier Declaration ¶ 11. Dr. Singer did not order Miller to have use of the Polo high top boots, Valadez-Meltzer Declaration ¶ 8, but instead deferred to Miller's treatment team the decision as to which would be most appropriate. The treatment team consisted of Purvis, Collier, Zeitler, and Anchan. Valadez-Meltzer Declaration ¶ 9. After the treatment team determined that the boots were dangerous, it initiated the process for ordering orthotic insoles for plaintiff. Collier Declaration ¶ 14.

On January 1, 2012, Miller was permitted access to his boots. That same day he chased another patient into the bathroom and used the boots to kick open a stall door and assault the individual. The boots were seized again and placed in the locked storage room. Purvis Declaration ¶ 14.

**Discussion**

Miller appears to raise his complaints against defendants in the context of a civil rights action pursuant to 42 U.S.C. § 1983, alleging (1) refusal to follow a physician's order that high

top boots be provided to treat an underlying foot condition, (2) undesirable physical side effects as a result of medications, and (3) confiscation of a chain and pendant bearing a religious symbol.  Although Miller refers to the Eighth Amendment in his pleadings, Eighth Amendment protections attach only "after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingram v. Wright*, 430 U.S. 651, 671-72 (1977). Thus, the Eighth Amendment is inapplicable here.

Nonetheless, patients involuntarily committed to state psychiatric facilities are afforded liberty interests under the Due Process Clause of the Fourteenth Amendment.  Therefore, the Court must analyze Miller's complaint within the scope of Fourteenth Amendment protections for patients who are involuntarily hospitalized at state psychiatric facilities, in order to provide such individuals with the services necessary to ensure their "reasonable safety" from themselves and for others.  *Youngberg v. Romeo*, 457 U.S. 307 (1982).  Indeed, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U. S. at 321- 22 (claim that hospital officials knew patient was being injured but failed to intervene; improperly restrained patient for prolonged periods; and were not providing appropriate treatment or training for his mental retardation); *see also Patten v. Nichols*, 274 F. 3d 829, 837 (4th Cir. 2001) (applying *Youngberg* standard to involuntarily committed psychiatric patients).

Under the *Youngberg* standard, the State must provide Miller with "adequate food, shelter, clothing, and medical care."  *Id*. at 315.  According to the Fourth Circuit, there is "no

constitutionally significant difference between the nature of the protection-from-harm claims . . . and the denial-of-medical-care [claims]."  *Patten*, 274 F.3d at 838.

In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance "'the liberty of the individual'" and "'the demands of an organized society.'" *Youngberg*, 457 U.S. at 319 (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961)). The Court applies the "professional judgment" standard, in which "the Constitution only requires that the Court make certain that professional judgment in fact was exercised." *Youngberg*, 457 U.S. at 321.  Decisions made by professionals are presumptively valid, and "liability may be imposed only when the decision by the professional is such a *substantial departure* from the acted professional judgment, practice, or standard as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323 (emphasis added).  In applying this standard, the Fourth Circuit has held that that a defendant's actions must have "so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional." *Patten*, 274 F.3d at 843.

Applying these standards here, the Court finds no evidence that confiscating heavy boots and a metal chain that could have posed a threat to Miller or others constituted a substantial departure from professional judgment or that these actions impacted Miller's health or ability to exercise his religious freedom.

Furthermore, while the Due Process Clause confers on Miller "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs," *Harper*, 494 U.S. at 221-22, such interest in avoiding forcible administration of psychotropic drugs is not unconditional.  Rather, it is balanced against the relevant state interests to determine whether Miller's constitutional rights were violated.  *See Youngberg*, 457 U.S. at 320-21.

The court's role is not to determine whether Miller was dangerous, but, rather, whether defendants exercised professional judgment.  *See Youngberg*, 457 U.S. at 321.  Here, defendants exercised professional judgment in the administration of Miller's medication (which Miller often refused to take), and modified the medication after Miller reported side effects.  Although Miller took the medications intermittently, he was never forced to take these medications against his will.  Nothing more is constitutionally required.

The Free Exercise Clause of the First Amendment is applicable to the states by virtue of the Fourteenth Amendment.  *See Employment Division v. Smith*, 494 U.S. 872, 876-77 (1990).  It provides that "Congress shall make no law ... prohibiting the free exercise" of religion.  U.S. Const. Amend. I.  Although Miller couches the brief confiscation of his cross pendant in terms of religious practice, nothing in the record suggests his ability to exercise his religious beliefs was in any way impacted by defendants' actions.

For all these reasons, defendants are entitled to summary judgment in this case.  A separate Order granting same and closing this case shall be entered forthwith.


May 15, 2012                                      /s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge